RANKIN v. BEARD. See Case No. 14,320.

RANKIN (DAWSON v). See Case No. 3,671.

RANKIN, The (DRAIN v.). See Case No. 2,294.

## Case No. 11,567.

RANKIN et al. v. FLORIDA, A. & G. C. R. CO.

[1 N. B. R. 647 (Quarto, 196);[1] 1 Am. Law T. Rep. Bankr. 85.]

District Court, N. D. Florida. April 14, 1868.

BANKRUPTCY — CORPORATION — PROVABLE DEBT— ACT OF BANKRUPTCY—ORDINANCE OF SECESSION — PROVISIONAL GOVERNMENT.

1. A corporation created for the purpose of carrying on any lawful business, defined by its charter, and clothed with power to do so, is such a corporation as is contemplated by the bankrupt act [of 1867 (14 Stat. 517)].

[Cited in Alabama & C. R. Co. v. Jones, Case No. 126; Sweatt v. Boston, H. & E. R. Co., Id. 13,684.]

2. Any debt, which may be proved by complying with any of the provisions of the bankrupt act, is a provable debt.

[Cited in Re Stansell, Case No. 13,293.]

3. Suffering a sale to take place from inability to resist is not an act of bankruptcy, even if by so doing one creditor should be preferred to another.

4. After the passage of the so-called "Ordinance of Secession," all acts passed by any pretended legislature are void. The governments organized in the states lately in insurrection, by direction of the president, are by act of congress declared provisional with full power to execute such laws as were in force prior to the passage of the so-called "Ordinance of Secession."

---

[1] [Reprinted from 1 N. B. R. 647 (Quarto. 196), by permission.]

5. A sale by the trustees under the provisions of the internal improvement act of Florida, of the stock, franchises, &c., of a corporation organized agreeably thereto, is not an act of bankruptcy.

The petition in this case sets forth: First. The amount and nature of the debt due the petitioners [Rankin & Pullan and others], and that said debts are provable in bankruptcy. Second. That the Florida, Atlantic and Gulf Central Railroad Company, a corporation created by the laws of the state of Florida, having its principal office at Jacksonville, and carrying on its business as such corporation within the Northern district of Florida, being in contemplation of insolvency, did, on the 10th day of January, 1868, transfer the said railroad and its appurtenances to the management of the Pensacola and Georgia Railroad Company, with intent to delay creditors. Third. That on the 29th day of January, 1868, the said company, in contemplation of insolvency, did make a transfer of two engines—"Lee" and "Stonewall"—to Messrs. Reed & Hooper, creditors of the company, with intent to prefer said creditors, and J. P. Sanderson and J. S. Sammis, sureties. Fourth. That said company, in contemplation of insolvency, did, on the said 29th of January, make a transfer of one of said engines, that the same might be sold and the proceeds applied to the payment of said debt, with intent to prefer John P. Sanderson and John S. Sammis, indorsers, and with intent to defeat the operation of the bankrupt act. Fifth. Same as the fourth, with intent to delay the operation of the act, and to prefer J. P. Sanderson and John S. Sammis, sureties. Sixth. That on the 10th day of January, 1868, the said company, in contemplation of insolvency, did transfer to J. S. Sammis $20,000 of the coupons cut from the first mortgage bonds of said company, to be deposited with Reed & Hooper, as collateral security for their demand, with intent to prefer Reed & Hooper and J. S. Sammis, surety, and to delay the operation of the bankrupt act. Seventh. That on the 29th day of January, 1868, said company being insolvent and indebted to the trustees of the internal improvement fund of the state of Florida in many thousands of dollars, an arrangement was entered into, in violation of this act, between said insolvent corporation and persons claiming to be the trustees of the internal improvement fund. Edward Houston, president of the Pensacola and Georgia Railroad, acting as such president and as agent of William E. Jackson and others, first mortgage bondholders of the Florida, Atlantic and Gulf Central Railroad Company, confederating to hinder and delay the operation of the bankrupt act, and with intent to prefer certain creditors holding first mortgage bonds of said company, and with further intent to relieve the president and directors of their liability to pay the amount due the trustees on account of the sinking

fund, and did cause a sale to be made on the 4th day of March, 1868, by the trustees of the internal improvement fund, of all the property of every kind and character of said company, including the franchise thereof, for a consideration, in violation of law, Edward E. Houston being purchaser as agent, &c., knowing said company to be insolvent, and with intent to defeat the operation of the bankrupt act. Eighth. That said company, on the 3d day of February, 1868, being insolvent, did transfer its property and franchise so that the trustees of the internal improvement fund did, by the sufferance of said company, and by its transfer, sell all the property of every kind belonging to said corporation for a sum far below its value, to wit, $111,000, and the further consideration that the purchaser was to put the road in repair and run the same with their trains; that at said sale Houston, as president and agent as aforesaid, became the purchaser, the trustees and purchaser having reasonable cause to believe that said company was insolvent, such sale having been made with intent to defeat the operation of the bankrupt act. Ninth. That the said company, the trustees and the purchasers, were acting in violation of the act and for the purpose of giving preference to creditors, and did jointly procure and cause such sale to be made on the 4th day of March, 1868, of all the property and franchise of said insolvent corporation, in violation of law, of the said act, and with intent to prefer creditors, and to delay the operation of the act. Tenth. That said company, on the 29th day of January, 1868, being insolvent, did instruct and fully authorize the president to execute the agreement between said insolvent corporation and the Pensacola and Georgia Railroad Company, in reference to the sale of said road and franchise by the trustees of the internal improvement fund, which sale was made on the 4th of March, 1868, in violation of the bankrupt act, and for the purpose of giving a preference to certain creditors who became the purchasers, and for whose benefit said sale was made, all parties having at the time reasonable cause to believe that said company was insolvent; said Edward Houston, agent for William E. Jackson and others, being the purchaser. Eleventh. Prayer for an injunction to prevent execution of titles or the completion of the sale, and enjoining the payment of the purchase money, and enjoining said company from making any disposition of its property until a final adjudication of this proceeding.

FRASER, District Judge. The respondent puts in an answer denying all the charges and allegations contained in the petition, and alleging that said corporation is not amenable to the bankrupt act, because it belongs to a system of network of state improvement and policy, and cannot be considered a private corporation. It is alleged, on the part of the debtor, that this is not such a business corpo-

ration as is contemplated by the bankrupt act, and therefore cannot be made amenable to that law and adjudged a bankrupt. A corporation created for the purpose of carrying on or pursuing any lawful business, defined by its charter and clothed with power so to do for the sake of gaining, is clearly such a corporation. Now this corporation is a common carrier, takes tolls, purchases, sells and mortgages property, contracts debts and other obligations, may sue and be sued. What more is necessary to fix upon it the character of a business corporation? It is also a private corporation. Its stock is held by private stockholders, and by the trustees of the internal improvement fund as private stockholders. See Internal Improvement Act, § 14. It is therefore amenable to the operation of the bankrupt act. Are these demands of the petitioners provable debts? Any debt which may be proved by complying with any of the provisions, or upon any conditions prescribed by the act, is a provable debt. The demands of the petitioners consist of what is termed "free land bonds," which are admitted to be a lien upon all bonds granted to the company for the purpose of constructing their road, and $825 in coupons, cut from the first mortgage bonds, which are a first lien upon the roadbed and its equipments. Now the petitioners may prove their debts by abandoning their lien and proving the whole amount, or they may ascertain the value of their securities, in any manner provided by the act, and prove for such balance as may remain after deducting such value. These debts are therefore provable, and the petitioners are properly in court.

We must next inquire whether, during the six months next preceding the filing of the petition, the said corporation was insolvent or contemplating insolvency. Nearly all the witnesses testify in general terms that the company was insolvent, and state, as a reason for their conclusion, that the receipts of the road were not sufficient to meet its current expenses, the floating debt, the interest on the bonds, and the sinking fund. Without further proof, this evidence would seem to establish the fact of insolvency. Other witnesses produced by the petitioners have given some certain data upon which to found a reasonable judgment. O. B. Hart testifies that mismanagement was the cause of failure to meet the liabilities of the company; that the receipts of the road were sufficient to pay the sinking fund, if the affairs of the company had been better managed. William Bryson, a former superintendent of the road, testifies upon a careful estimate made by him, that on the 4th day of March, A. D. 1868, the roadbed, rolling stock and equipments, and the property generally appertaining to the use of the road, were of the value of $891,862.55. Mr. Daniel, the agent of the trustees for the bonds of the company, and well informed as to the value of the lands, fixes their value at $315,000. These estimates will fix the value

of the road and lands at $1,206,862.55. Mr. Maxey, the secretary and treasurer of the company, states the mortgage debt of the company on first mortgage and free land bonds to be $755,000, and the general indebtedness not secured by mortgage, without deducting payments, at about $85,000, making the indebtedness of the company—without deducting the $89,000 charged against the internal improvement fund, the six or seven thousand dollars paid to Reed & Hooper, the bonds still unsold, payments to operatives, and so forth—the sum of $840,000. Add to this sum interest on the bonded debt for three years, say $180,000, and the entire indebtedness of the company amounts to the sum of $1,020,000. Deduct this amount from the amount of assets and the result shows a balance in favor of the assets of $186,862.55.

With such facts proved by the petitioners themselves, the conclusion is irresistible that the company was solvent up to the day of sale by the trustees of the internal improvement fund.

Did the said corporation, in contemplation of insolvency, make any payment, conveyance, or transfer of money or other property, estate, rights, or credits; or suffer or procure its property to be taken on legal process, with intent to give a preference to one or more of its creditors, or to any persons liable for said corporation as indorsers or sureties, or with intent to defeat or delay the operation of the bankrupt act? It appears that said corporation, not having the ready money to pay the debt due the sinking fund, having exhausted all its means of opposition to the sale by the trustees, and being advised by counsel that further opposition was hopeless, did suspend its opposition, being informed at the time that the trustees had arranged with certain first mortgage bondholders that the said road and franchise should not sell for less than twenty per cent. of the whole amount of the principal of the first mortgage bonds, to wit, the sum of $111,000, and that upon said sale the said bondholders should present three fourths of said first mortgage bonds for redemption and cancellation at that rate, and should receive in lieu of the interest coupons due upon the same lands belonging to the internal improvement fund. The railroad property and franchise of the corporation were sold by the said trustees on the 4th of March, A. D. 1868, and it appears that the parties are waiting the result of this examination to complete their arrangement. When complete, the indebtedness of the corporation will be reduced three fourths of the amount of principal of the first mortgage bonds, with three fourths of the estimated interest due thereon, amounting to $486,750. Add to this the $20,000 due the sinking fund paid out of the balance of the purchase money, and deduct the sum from the amount of the indebtedness of the corporation, and there remains a balance of $513,250, a trifle more than one half of its indebtedness before the sale. Deduct this amount from

the estimated value of the assets, and the assets of the corporation will exceed its indebtedness $693,612.55. With such a result in view it cannot well be said that said corporation suffered or procured its property to be seized or sold in contemplation of insolvency, or with intent to prefer creditors when it leaves the remaining creditors with double the security which they had before the sale; or that it was done with intent to defeat and delay the operation of the bankrupt act, when it placed the corporation in a condition in which it was far less liable ever to bring itself within the operation of that act. It would seem that if it did suffer or procure the sale to be made, it did so in contemplation of a higher degree of solvency and not of insolvency; but the evidence shows that it did not suffer the sale to take place, except from inability to resist.

But it is objected that this sale is void, there being on the 4th of March, 1868, in the state of Florida, no legal state officers authorized to act as trustees under the provisions of the internal improvement act of the state. It is true that upon the passage of the so-called "Ordinance of Secession," passed in convention on the 10th day of January, 1861, which was the opening of hostilities by the state of Florida against the government, a legal state government in the state of Florida ceased to exist. It follows as a necessary consequence that after that date all laws passed by any pretended legislature were and are absolutely null and void. At the cessation of hostilities the government found here an organized government, deriving no authority from, and not organized under, the constitution of the United States. The people of the state afterwards undertook, by the direction of the president, but without the sanction of the general government, to restore the state to its former relations to that government, by adopting the new constitution not hostile to it, and professedly working under the constitution of the United States. This government was declared illegal by congress; but, with its accustomed wisdom and beneficence, congress saw fit to vitalize and adopt it "as provisional only," in order to keep dormant the destructive forces of anarchy. The governor and other officers of the state thus recognized could, in virtue of such recognition, execute such laws only as were in force on the 10th day of January, 1861, and which are not repugnant to the constitution and laws of the United States. For such purpose and for such alone, they are state officers, as completely invested with power to execute such laws as if legally elected, with the exception that their acts are subject to revision by the military commanders of the district. Now the act entitled "An act to provide for and encourage a liberal system of internal improvements in the state of Florida" became a law in January, 1855. It follows, then, that the governor, the comptroller, the state treasurer, the attorney general, and the register of public lands as trustees of the internal improvement fund, might, by virtue of the authority with which they were invested by the internal improvement act, and for the causes and purposes set forth in that act, take possession of and sell said railroad and all its property of every description, and that a sale made by them in pursuance of the provisions of that law is valid.

It will be proper here to inquire what is the effect of the sale by the trustees upon the corporation and its liabilities, in order to ascertain whether its creditors are in any manner delayed or preferred, and whether, in any aspect, such sale is a fraud upon the bankrupt act. First, then, does the sale by the trustees of the franchise and other property of the corporation work its dissolution? Second. Are the liens upon its property divested and its debts extinguished? Third. If not dissolved, does it continue to be the same corporation, exercising the same powers, under the same charter as before the sale? Fourth. If transformed by the sale into a new corporation, from what law does it derive authority to exercise corporate power? Fifth. If it remains the same corporation, clothed with all its powers and privileges under the charter, by what law is it released from the payment of its debts? Sixth. If not released, what law prevents the creditors from enforcing their demands against the corporation?

The first section of the charter provides that all subscribers for stock, their successors and assigns, shall be a corporation, and have and exercise corporate powers, they and their successors and assigns, without limitation. The fourth section provides that the directors elected by the stockholders shall continue in office one year and until new directors shall be elected; and if from any cause whatever there should at any time be no election of directors, the corporation shall not, for that cause, be dissolved, but the directors and other officers then in office shall continue, with all the powers herein mentioned, until an election of new directors can and does take place. The tenth section provides that all the property of the company and all the works constructed under the authority of this act, and all profits which shall accrue from the same, shall be vested in the stockholders of the company forever, in proportion to their shares. The thirteenth section provides that all property assessed and paid for, agreeably to the provisions of this act, and all donations made to and for the same, shall forever afterwards belong to and become the property of said company, its successors and assigns, in fee simple, in proportion to the number of shares owned by the stockholders respectively. The fourteenth section provides that the stock of said company, and all the property belonging thereto or which may from time to time be acquired by said company, shall be held jointly and not separately. It is clear, from these extracts from the charter, that the leg-

islature intended to invest this corporation with a legal immortality, not to be dissolved by assignment or sale, and has vested a joint interest forever in the stockholders in all its property and stock. The third section of the internal improvement act provides that "all bonds issued by any railroad company under the provisions of this act shall be a first lien or mortgage on the road-bed, iron, equipments, workshops, depots and franchise; and upon a failure on the part of any railroad company, accepting the provisions of this act, to provide the interest as herein provided in the bonds issued by said company, and the sum of one per cent. per annum as a sinking fund as herein provided, it shall be the duty of the trustees, after the expiration of thirty days from said default or refusal, to take possession of said railroad and all its property of every kind, and advertise the same for sale at public auction to the highest bidder, either for cash or additional approved security, as they may think most advantageous for the interest of the internal improvement fund and the bondholders. The proceeds arising from such sale shall be applied by said trustees to the purchase and cancelling of the outstanding bonds issued by said defaulting company, or incorporated with the sinking fund: provided, that in making such sale, it shall be conditioned that the purchaser shall be bound to continue the payment of one half of one per cent. semiannually to the sinking fund, until all the outstanding bonds are discharged, under the penalty of an annulment of the contract of purchase, and the forfeiture of the purchase money paid in."

Now, in the foregoing clause of the act, provision is made for a sale for cash or additional security. Additional security for what? Evidently for the bonds issued under the provisions of this act. Security additional to what? Clearly in addition to "the road-bed, iron, equipments, workshops, deposits and franchise," upon which the bonds are a first lien or mortgage. If sold for cash, the money is to be applied to the purchase and cancellation, not to pro rata payment of the bonds, or incorporated with the sinking fund, showing the intention of the legislature to be that the lien of the bonds upon the road, its property and franchise, should not be disturbed by the sale. But if the corporation be dissolved by the sale, there remains no franchise to which such lien can attach, and the bondholders are entirely at the mercy of the trustees. We cannot think, then, that the legislature intended to dissolve the corporation by such sale, but simply to transfer its management to more efficient hands. The act looks to a continuance of the operation of the road, to the payment of the one per cent. annually to the sinking fund, and to the exercise of corporate powers by the purchasers. The sale is not a judicial one where the property goes to the purchaser divested of all liens, and where the liens

follow the fund into court and seek satisfaction there, out of the proceeds of the sale. Priorities are not to be considered. liens are not to be satisfied, debts are not to be paid with the proceeds of the sale, but bonds are to be purchased or the money is to go into the sinking fund. The stock is part of the property of the company, and the stockholders have a joint interest therein, when sold the purchasers take such interest as the original stockholders had in the corporation and its property. In other words, the sale divests the stockholders of their interest and vests it in the purchaser. The stock simply changes hands, and I can see no difference upon principle in the effect of the sale where the stockholders make the transfer individually or where they have agreed to another mode of transfer as in this case, where all the stockholders transfer their stock at the same time, the new stockholders take the stock with all its incidents, that is, the property and franchise of the corporation; in other words they become and are the corporation. Now, suppose that all the stockholders agree, as in this case, by accepting the internal improvement act, that upon the happening of a certain event, certain other persons shall make the transfer for them, and the transfer is made according to the terms of said agreement by the person designated; can any sound reason be given why the effect of the sale in one case should differ from that in the other? Both transfer the stock and all other property of the corporation. Wherein, then, do they differ and why? I confess that after most careful reflection and examination, I have failed to discover any legal grounds or any good reason for determining that the legal effect of the sale is not the same in both cases. If this be so, the sale by the trustees does not dissolve the corporation any more than a simultaneous transfer of stock by all the stockholders dissolves it. The corporation then continues to exist in the purchaser as it did in the stockholder before the sale. The corporation is the identical legal person, possessing all the rights, powers, and privileges, and subject to the same responsibilities and duties. It cannot divest itself of its responsibilities any more than of its powers, and remain the same corporation. There is no provision in the internal improvement act which operates to divest any lien or discharge any debt of the corporation through the sale without payment or purchase of the debt. The power of suing, and being sued, still remains a part of its franchise; otherwise, it has no charter, no franchise, and is no longer a corporation for any purpose. If then, it retains its identity with all its original powers, by what sleight of hand or illusion has it discharged itself from the payment of its debts. These debts were valid obligations of the company once; how have they become dissolving phantoms without substance? By what law or by what agree-

ment have they been cancelled? The creditors to whom these debts were payable could once sue the corporation and recover. What law has taken away this remedy? I have been unable to discover any.

Suppose the corporation were to be sued upon a debt created before the sale, what plea could be interposed to bar the recovery? Would it be, that the franchise and property of the corporation had passed by sale into the hands of stockholders who did not create the debt, and ought not, therefore, be required to pay it? The same plea would be as effectual a bar, in behalf of new stockholders who had become possessed of stock, in any other way, since the debt was contracted. We may as well say that the human body, the whole of whose particles are said to change in seven years, is not the same body, as to say that a corporation, whose stockholders have changed, is not the same corporation. The one allegation is as absurd as the other. The charter provides that all subscribers for stock, their successors and assigns shall be a corporation, and have and exercise corporate powers. This grant is made to the original stockholders, their successors and assigns, and to none other. The purchasers at the sale by the trustees are, therefore, successors or assigns of the original stockholders, and their successors and assigns, or they cannot take and exercise corporative powers by virtue of their purchase. The sale by the trustees is a mode of assignment agreed upon between the state and the corporation, and in virtue of such sale the purchasers become the assigns and successors of the original stockholders, succeeding to all the rights, powers, duties, and liabilities of said stockholders as a corporation. The corporation not being discharged from its debts, and those debts being reduced one half by the sale, the creditors are not delayed, but benefited, by the sale, neither is the sale a fraud upon the bankrupt act. Until new directors are elected, the present officers of the company are authorized to act. The engines "Lee" and "Stonewall" are still the property of the company, where the sale found and left them. The taking up of transportation certificates, and payment for cross-ties, were proper payments in the regular course of business. The transfer and hypothecation of coupons to Reed & Hooper, as collaterals, were properly made in compliance with the terms of a prior contract, and were not made when the corporation was insolvent or contemplating insolvency. No act of bankruptcy has, therefore, been committed by this corporation.

The prayer of the petitioners that the Florida, Atlantic and Gulf Central Railroad Company be adjudged a bankrupt must be denied. This order came on to be heard upon petition and answer, and was argued by counsel, and the same, together with the proofs and allegations of the parties having been duly considered, and it appearing to the court that the proofs do not sustain the allegations in the petition, and that no cause for an adjudication of bankruptcy is shown thereby, it is thereupon ordered, adjudged, and decreed, that the petition of the petitioners be, and the same is hereby dismissed. It is further ordered, that the said petitioners do pay all the costs of this proceeding to be taxed; and that the said Florida, Atlantic and Gulf Central Railroad Company do recover costs of and from said petitioners in pursuance of the 31st rule of the general orders in bankruptcy prescribed by the supreme court of the United States.   .