## In re SAN GABRIEL SANATORIUM CO.

(District Court, S. D. California. June 26, 1899.)

No. 1,200.

BANKRUPTCY—INVOLUNTARY PROCEEDINGS—CORPORATIONS.

A corporation which owns and maintains a private hospital for consumptives, conducting its business for profit, and not as a charity, furnishing to its patients the usual accommodations of a hotel, and treating their diseases chiefly by the inhalation of an antiseptic vapor, chemically prepared on the premises, though not a "manufacturing" corporation, within the meaning of section 4 of the bankruptcy act (30 Stat. 547), is a corporation "engaged principally in trading or mercantile pursuits," and may be adjudged bankrupt on involuntary proceedings against it.

In Bankruptcy. On petition for adjudication in involuntary bankruptcy.

Dillon & Dunning, for petitioning creditors.

D. P. Hatch, for bankrupt.

WELLBORN, District Judge. The court having heretofore announced its findings in favor of petitioners, so far as concerns the acts of bankruptcy charged in the petition, the only question now to be disposed of is whether or not respondent is such a corporation as may be adjudged an involuntary bankrupt; or, more specifically, whether or not respondent is a corporation "engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits." The purposes for which respondent was formed are set forth in its articles of incorporation as follows:

"(1) To acquire by construction, purchase, exchange, or other means, and thereafter to own, maintain, operate, and carry on, or to sell or otherwise dispose of sanatoriums and other establishments suitable for the care and treatment of the sick. (2) To acquire by purchase or other means, and thereafter use and employ, or to sell or otherwise dispose of pneumo-chemic and other systems for the treatment of persons afflicted with tuberculosis and other diseases. (3) To acquire, own, hold, sell, convey, and mortgage such real and personal property as may be necessary, proper, or convenient in carrying on the business of the corporation."

A circular letter issued and distributed by respondent contains the following statement as to its location:

"The San Gabriel Sanatorium is delightfully located between the cities of Los Angeles and Pasadena. It is surrounded with six acres of fine lawn, shaded with live oak, orange, palm, and other tropical and semitropical trees and shrubs in profusion. The building has one hundred comfortable, furnished rooms, heated by steam and lighted with gas, together with a climate that is unsurpassed, making an ideal spot for a health-seeker."

The circular letter already mentioned describes the character of respondent's business, as follows:

"Our system of treatment is that of filling the apartments of each patient with an antiseptic germicidal air by means of an evaporator, which has a capacity sufficient to saturate the air continually. In addition to this, fresh air is forced through a battery of cylinders containing the antiseptic germicidal fluid, consisting of oil of tar, oil of eucalyptus, thymol, menthol, pine tar, permanganate of potash, and carbolic acid. After passing through the fluid, the moisture is extracted. This gives us practically a dry, medicated air, which is conveyed to the apartment of each patient in sufficient quantities to maintain the normal amount of oxygen to meet the requirements of the nutritive function. In this atmosphere the patient is asked to practice forced inhalations and forced exhalations, under proper directions, and soon the following results are observed: The physical examination shows that the lungs are clearing up, the respirations approaching normal," etc. "The treatment of phthisical patients by inhalation is not only rational and practicable, but it is strictly in harmony with therapeutic law. By this means of administration it is not irritating, and the air is so thoroughly impregnated that the medicaments must reach every portion of the lung tissue that air in any form can reach."

In another publication made by it, respondent refers to its location, and characterizes its business thus:

"This system of treatment is administered under the direction of the National Pulmonary Company, and is in operation at San Gabriel Sanatorium, San Gabriel, California, near Los Angeles, and at other points. The San Gabriel Sanatorium is owned and operated by the San Gabriel Sanatorium Company. The sanatorium is lighted with gas and heated by steam and open fires. The rooms, over one hundred in number, are cheerful, sunny, and well furnished. Many suites have private baths. The sanatorium is delightfully located, surrounded by twelve acres of land, fruit trees, and shrubs. A billiard room, lawn tennis court, and croquet grounds are free for the use of patients. * * * We desire to call particular attention to the salutary influence of the stimulating antiseptic vapor on the ulceration consequent to the tubercular process. Every physician must have noticed the rapid decline of phthisical patients where a large quantity of purulent matter was expectorated,—direct proof of extensive ulceration. * * * We recognize the importance of creating within the lungs and air passages a medium in which the pathogenic germ cannot live or thrive, by the continuous inhalation of a sterilizing vapor, and at the same time of increasing the resisting power of the body, by proper exercise, good food, tonics, etc. This is accomplished under our method as follows: First. In the apartment of each patient there is placed one of our vaporizers which is of sufficient capacity to saturate the air of a room, night and day, by evaporation. Second. Fresh air is drawn from the outer atmosphere, high above the earth's surface by an air pump, and forced, under moderate pressure, through a system of piping into the room of each patient, where it is expelled into the antiseptic fluid contained in the evaporizer. This fresh air becomes thoroughly impregnated with the sterilizing properties of the antiseptic fluid, and is introduced into the room in quantities sufficient to maintain the normal proportion of oxygen to meet the requirements of the system. In this atmosphere the patient sleeps, and at intervals during the day practices breathing exercises as prescribed. Third. A special treatment room is provided where the vaporized antiseptic is more concentrated than is needed in the living apartments. In this 'strong room' the patients practice breathing exercises for twenty minutes three times a day. Fourth. Pulmonary gymnastics and proper exercises are prescribed and practiced. In cases where there are complications, they are treated according to the laws of regular medicine."

The proof shows that respondent's institution is not a charity, but conducted on the lines indicated in the foregoing extracts, and for profit. Patients are lodged and furnished with the usual accommodations of a hotel at the sanatorium, the rates charged being $25 per week, and upward. Cigars are kept on sale at the sanatorium by the respondent for the benefit of those who desire them. Petitioners furnished cigars and groceries to respondent for use at its sanatorium.

Section 4 of the bankrupt act is as follows:

"Sec. 4. Who May Become Bankrupts. a. Any person who owes debts, except a corporation, shall be entitled to the benefits of this act as a voluntary bankrupt. b. Any natural person, except a wage-earner or a person engaged chiefly in farming or the tillage of the soil, any unincorporated company, and any corporation engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits, owing debts to the amount of one thousand dollars or over, may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this act. Private bankers, but not national banks or banks incorporated under state or territorial laws, may be adjudged involuntary bankrupts."

While the artificial atmosphere used at respondent's sanatorium is doubtless the product of a manufacturing process, I am not prepared to hold that manufacturing is respondent's principal business. Nor is there any proof showing that respondent's business is that of printing or publishing. I am of the opinion, however, that respondent may be properly classified as a trading or mercantile corporation; that is, a corporation principally engaged in trading or mercantile pursuits. To the proposition that "a corporation created for the purpose of carrying on or pursuing any lawful business defined by its charter, and clothed with power so to do for the sake of gain, is clearly a business corporation, and amenable to the provisions of the bankruptcy act," petitioners cite: Bump, Bankr. p. 773; Railroad Co. v. Jones, 1 Fed. Cas. 275; Adams v. Railroad Co., Id. 91; Rankin v. Railroad Co., 20 Fed. Cas. 274. These authorities, however, are interpretations of the bankruptcy act of 1867, of which section 37 is as follows: "Sec. 37. And be it further enacted that the provisions of this act shall apply to all moneyed, business or commercial corporations and joint stock companies," etc. (14 Stat. 535), and, of course, are not determinative of the meaning of the bankruptcy act of 1898; but the meaning of said last-mentioned act must be ascertained from its own peculiar phraseology. In construing said act, however, a few general definitions will be helpful. The word "mercantile" is defined thus: "Pertaining to merchants, or the business of merchants." Webst. Dict. "A merchant" is "one whose business it is to buy and sell merchandise," and "merchandise" is "a term including all those things which merchants sell, either wholesale or retail, as dry goods, hardware, groceries, drugs, etc." Bouv. Law Dict. "Merchant" includes "hotel keeper." Campbell v. Finck, 2 Duv. 107. It has been held that one who keeps on livery, or boards, horses belonging to other persons, is a merchant. In re Odell, 18 Fed. Cas. 574. See, also, Black, Bankr. p. 32. "Trader" is thus defined:

"One who makes it his business to buy merchandise or goods and chattels, and to sell the same for the purpose of making a profit. The quantum of dealing is immaterial when the intention to deal generally exists." 3 Starkie, 56; 2 Car. & P. 135; 1 Term R. 572.

The principal question is whether the person has the intention of getting a living by his trading. If this is proved, the extent or duration of the trading is not material. 3 Camp. 233; 2 Bouv. Law. Dict. 741; In re Cowles, 6 Fed. Cas. 672. A baker who buys flour and makes it into bread for sale is a trader. In re Cocks, 5 Fed. Cas. 1154. A stairbuilder is a trader. In re Garrison, 10 Fed. Cas. 49.

These authorities, I think, fairly outline the character of a merchant or trader, within the meaning of the bankruptcy law, although there are some cases which give to the words more restricted significations, as In re Smith, 22 Fed. Cas. 394.

Respondent contends that, inasmuch as the ultimate object of its business is the cure of consumptives, it is not a corporation principally engaged in trading or mercantile pursuits, resting its argument largely on the word "principally," used in section 4 of the bankruptcy act above quoted. This word "principally," it seems to me, does not denote the object or end of a pursuit, as claimed by respondent, but is employed here to distinguish a calling, usual occupation, from an isolated single transaction. Thus, if an incorporated charity—a public free hospital, for instance—should buy a horse to be used in conveying patients to and from the hospital, and, finding the horse unfit for such use, should sell it, this one purchase and sale would not bring the hospital within the classification of a corporation principally engaged in trading or mercantile pursuits; but if an incorporated company such as a private hospital be conducted in a business way for profit, and not on charitable lines, it is, I think, a trading or mercantile corporation, within the meaning of the present bankruptcy law, no matter what may be the result or effects it purposes to accomplish with or upon its patrons. A decree adjudging respondent a bankrupt will be entered.