### In re UNITED STATES HOTEL CO.

#### UNITED STATES HOTEL CO. v. NILES et al.

(Circuit Court of Appeals, Sixth Circuit. December 6, 1904.)

No. 1,331.

**1. BANKRUPTCY—HOTELS.**

A hotel company engaged in furnishing rooms and meals to guests is not a corporation principally engaged in trading or mercantile pursuits, and therefore cannot be adjudged a bankrupt, within Bankr. Act July 1, 1898, c. 541, § 4, 30 Stat. 547 [U. S. Comp. St. 1901, p. 3423].

[Ed. Note.—What persons are subject to bankruptcy laws, see note to Mattoon Nat. Bank v. First Nat. Bank, 42 C. C. A. 4.]

Appeal from the District Court of the United States for the Northern District of Ohio.

E. J. Thobaben, for petitioners.

Amos Burt Thompson, for respondent.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge. Appeal from an adjudication of involuntary bankruptcy. The only question is whether a corporation which is engaged in the business of keeping a hotel is a corporation which may become an involuntary bankrupt, under the provisions of section 4 of the bankrupt act (Act July 1, 1898, 30 Stat. 547, c. 541 [U. S. Comp. St. 1901, p. 3423]). The hotel company is a corporation of the state of Ohio, engaged in operating a hotel in Cleveland, Ohio, known as the "Weddell House." The referee reported that the management of "the hotel gave dinner, supper, and breakfast and furnished meals for a consideration; and liquors were sold in its barroom over the counter to be drunk on the premises; the same being furnished to guests of the hotel and to others coming for that purpose. The hotel also supplied lodgings. The regular rates were 75 cents for each meal and 75 cents for lodging." Upon this description of the business of the United States Hotel Company the question is whether it is a "corporation engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits," within the meaning of section 4 of the bankrupt act.

Allegation of the petition was that it was "a corporation engaged principally in trading." That it was not a corporation engaged principally in "manufacturing," "printing," "publishing" or "mercantile pursuits" is clear, and, if it is a corporation subject to being proceeded against as an involuntary bankrupt, it must be because it was engaged in "trading" within the meaning of that term of

134 F.—15

the law. In the ordinary meaning of the term, "a trader is one who makes it his business to buy merchandise or goods or chattels and to sell same for the purpose of making a profit." 2 Bouv. Law Dict. 741. In Black's Law Dictionary a trader is said to be "one whose business is to buy and sell merchandise or any class of goods, deriving a profit from his dealings." That one engaged principally in "trading" is one whose chief business is to buy and sell for profit goods and chattels is well settled. In re Smith, 2 Low. 69, Fed. Cas. No. 12,981; In re Cameron Ins. Co. (D. C.) 96 Fed. 756, 757; In re New York, etc., Water Co. (D. C.) 98 Fed. 711; In re Surety, etc., Co., 121 Fed. 73, 56 C. C. A. 654.

The present bankrupt act is confessedly narrower in its application to corporations than the act of 1867. The older act applied "to all money, business, or commercial" corporations. The present is restricted to such as are "principally engaged in manufacturing, trading, printing, publishing, or mercantile pursuits." This change in terms is significant of a purpose to restrict the act, and this purpose must be taken into account in the interpretation of the terms used to describe the kind of corporation to which the new act applies. That the business of keeping a hotel involves the buying and selling of articles of food and drink is true only in a very limited sense. Such a business does not involve the buying of goods or merchandise in such sense as is understood when we say one is engaged in trading. The articles which are bought are not bought to be sold again as merchandise or goods merely for the profit between cost and sale price. They are bought to be made up into edible food or drink, and in that form to be served to guests as food, and the price includes rent, service, heat, light, etc.

Until changed by a statutory declaration of the persons comprehended by the term "trader," an innkeeper was held not to be a trader. Newton v. Trigg, 1 Showers, 96; Luton v. Bigg, Skinner, 276, 291; Willitt v. Thomas, 2 Chitty, 691; Harman v. Clarkson, 22 U. C. Com. Pl. 291. Thus in Luton v. Bigg, cited above, it was said of an innkeeper:

"He is in the nature of a public person, and his house and occupation a thing of necessity, and his gain does not arise from the victuals which he sells, but from his furniture and attendance."

In Newton v. Trigg, cited above, it was said:

"An innkeeper cannot get his own prices, but is bound to a reasonable price. A tradesman may sell to whom he pleases. An innkeeper cannot refuse his guest. He doth not get by buying and selling. He gets by the price and hire of his lodging, also by the profit on the ale of kitchen. The profits from his stables do not arise from hay alone, but from the standing."

In view of the fact that the popular meaning of the term "trader" and its technical meaning, as defined by the courts prior to any statutory definition of the persons comprehended by the term "trader," did not include one who keeps a hotel or inn, is there anything in the act of 1898 which requires so broad a meaning as is now insisted upon? The act of 1867 forbids a discharge to a "merchant or tradesman" who had not kept proper books. Blatchford, District Judge, held that a livery stable keeper was a tradesman

within the meaning of this clause, because he bought and sold grain and hay when he fed horses boarded with him. In re Odell, Fed. Cas. No. 10,426. It also appeared in that case that he bought and sold horses and vehicles, buying to carry on the business and trading or selling when the animal or vehicle was no longer suitable for hiring. This fact doubtless influenced the result. This is claimed to be a judicial construction of the term "trader," which we are to presume was adopted by Congress in the enactment of the present law. A single decision resting upon peculiar facts would be slender authority for assuming that Congress meant to include livery stable keepers as persons "principally engaged in trading," because horses were fed with provender bought for that purpose. In re Morton Boarding Stables (D. C.) 108 Fed. 791, District Judge Brown, while expressing a different view, followed the case as a judicial interpretation of the term "trader" under the old law, which it was reasonable to suppose was adopted by Congress as a proper characterization of a trader under the new law. Following the case out to its extreme results, Judge Wellborn held that a corporation maintaining a private hospital for consumptives, furnishing them the usual accommodations of a hotel, was a corporation principally engaged in trading or mercantile pursuits. In re Sanitorium Co. (D. C.) 95 Fed. 271.

But In re Odell was not the only definition of "tradesman" under the old bankrupt laws. Thus in Hall v. Cooley, Fed. Cas. No. 5,928, Judge Conkling held that livery stable keepers, as such, were not "merchants or persons using the trade of merchandise," under the bankrupt law of 1841. He also held that the owner of timber lands, who cut his trees and made them into lumber, was neither a merchant nor a trader. In this case Judge Conkling refers to Act 6 Geo. IV, c. 16, passed in 1825, as having extended the scope of the bankrupt laws by a list of persons included as tradesmen or merchants. Among these classes brought under the law were "persons who seek their living by buying and letting for hire." But, said the judge:

"Congress not having seen fit to adopt this provision, it is entirely clear that any decisions founded on it are inapplicable here."

Judge Lowell twice defined a "tradesman" under the act of 1867. After referring to the perplexities growing out of the indefiniteness of the class called "tradesmen" or "traders" under English usages, and to the fact that the Parliament had put to rest many troublesome questions by the act already referred to, by giving a list of the occupations which should constitute trading within the English bankrupt laws, said that our Congress had not defined a tradesman, and that "the question is, therefore, addressed to the common usage of this country, and to the judge's knowledge of his own language. The meaning of 'tradesman,'" said he, "is substantially the same as 'shopkeeper.' 'Merchant,' in this connection, contrasts with 'tradesman,' as the greater with the less, and not vice versa." He held, therefore, in Re Cote, 2 Low. 374, Fed. Cas. No. 3,267, that a farmer who occasionally bought and sold horses, cattle, and hay

was not bound to keep books as a tradesman. In the case of In re Smith, 2 Low. 69, Fed. Cas. No. 12,981, Judge Lowell again defined a tradesman as "one who makes it his business to buy merchandise or goods and chattels to sell the same for the purpose of making a profit." A railway contractor was held not to be a tradesman. In the case of In re Stickney, Fed. Cas. No. 13,439, Judge Dillon held that the word "tradesman" in the act of 1867 must be given the narrow meaning originally attached to it under the English bankrupt laws, and meant a small shopkeeper or merchant.

It follows that, if any importance is to be attached to the meaning of the word "tradesman" under the prior bankrupt laws by reason of judicial construction of the term by the inferior courts, the great weight of authority was in favor of a construction which accorded with the popular meaning of the term and with the opinion of the English judges prior to the British act of 1825, which specifically prescribed the occupations embraced under the term "trader." The Congress has not seen fit to define the occupations which are meant to be included under the description of corporations "engaged principally in trading." That its "principal business" shall be "trading" is required, for if trading be a minor object, wholly incidental to some greater purpose, it is not then embraced among the corporations subject to the law. Then, again, it is inferable that Congress intended that the term "trading" should mean an occupation different from that of a "manufacturer," or of one engaged in "mercantile pursuits." Otherwise the different terms would not have been used.

In view of the manifest intention of Congress to restrict the operation of this law in respect of its application to involuntary proceedings against corporations, and to the fact that the word "trading" is used in contradistinction to the words descriptive of other occupations, we conclude that the term "trading" is used in its well-defined, limited sense as understood before the English parliamentary act of 1825, and that a corporation engaged in keeping an inn or hotel is not a corporation principally engaged in trading or mercantile pursuits. The general trend of opinion has favored such a limited interpretation. In re Surety Guarantee & Trust Co., 121 Fed. 73, 75, 56 C. C. A. 654; Philpot v. O'Brion, 126 Fed. 167, 61 C. C. A. 111; In re New York Water Co. (D. C.) 98 Fed. 711. In re Pacific Coast Warehouse Co. (D. C.) 123 Fed. 749, a warehouse company was held not to be a trading corporation. A company to buy and sell stocks and bonds was held not to be a trading company in Re Surety Guarantee & Trust Co., cited above. Nor a fire insurance company. In re Cameron Co. (D. C.) 96 Fed. 756. Nor a building and loan association. In re New York Building-Loan Banking Co. (D. C.) 127 Fed. 471. Nor a water company. 98 Fed. 711. Nor a theatrical company. In re Oriental Society (D. C.) 104 Fed. 975. Nor a laundry company. In re White Star Laundry Co. (D. C.) 117 Fed. 570. Nor a transportation company. In re Phil. Transp. Co. (D. C.) 114 Fed. 403. Nor a freight forwarding company, although it did some trading. In re Quimby Forwarding Co. (D. C.) 121 Fed. 139. Nor a public circulating library. In re

Parmelee Library, 120 Fed. 235, 56 C. C. A. 583. Nor a social club. In re Fulton Club (D. C.) 113 Fed. 997. Nor a mining company. In re Elk Park Mining & Milling Co. (D. C.) 101 Fed. 422; In re Woodside Coal Co. (D. C.) 105 Fed. 56; In re Keystone Coal Co. (D. C.) 109 Fed. 872.

By amendments mining companies have recently been brought within the act, "not by the use of broad general language, but by the addition of 'mining' to the pursuits mentioned in the original act." "The positive inclusion of mining companies, and mining companies alone, indicates a recognition by Congress that the words 'trading' and 'mercantile' in the original act were not intended to be the equivalent of 'moneyed business or commercial corporations' under the act of 1867." In re Quimby Forwarding Co. (D. C.) 121 Fed. 139, 141.

In the case of In re Chesapeake Oyster & Fish Co. (D. C.) 112 Fed. 961, Judge Hallett held that a corporation engaged in keeping a restaurant and saloon was not a trading corporation, and distinctly disapproved of In re San Gabriel Sanatorium Co. (D. C.) 95 Fed. 271, and In re Morton Boarding Stables (D. C.) 108 Fed. 791. In Re Barton Hotel Co., 12 Am. Bankr. Rep. 335, Justice Stafford of the Supreme Court of the District of Columbia said "that the principal and distinguishing features of the hotel business was not the purchase and sale of commodities, but the furnishing of the traveling public with a temporary home, with bed and board and service, and the ordinary comforts of an abiding place," and that it would be "a great stretch of language which could enable us to speak of such a business as a trading or mercantile business."

Reverse the adjudication, and remand, with direction to dismiss the petition, with costs.