UNITED STATES v. AMERICAN MEDICAL ASS'N et al.

No. 63221.

District Court of the United States for the District of Columbia.

July 26, 1939.

754

Thurman Arnold, Asst. Atty. Gen., and John Henry Lewin and Allan Hart, Sp. Assts. to Atty. Gen., and Smith Brittingham, of Norfolk, Va., Sp. Atty., for the United States.

William E. Leahy, of Washington, D. C., Edward M. Burke, of Chicago, Ill., and Charles S. Baker, Adrien F. Busick, Seth W. Richardson and John E. Laskey, all of Washington, D. C., for defendants.

PROCTOR, Justice.

The indictment charges a conspiracy to restrain trade in the District of Columbia in violation of Section 3 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 3. The defendants are American Medical Association, a national organization of physicians; two of its subordinate bodies, the Medical Society of the District of Columbia and Harris County Medical Society of Houston, Texas; also the Washington Academy of Surgery, not fully identified; and twenty-one individual doctors, all members of the national body, some officers thereof, others members and officers of the Medical Society of the District of Columbia. All defendants have demurred to the indictment. It is very long, and only abbreviated references will be made to such parts as are deemed necessary to this decision.

Group Health Association, Inc (hereinafter called Association), is alleged to be an association of Government employees, engaged "in the business of arranging for the provision of medical care and hospitalization to its members and their dependents on a risk sharing pre-payment basis". Medical care is provided by a staff of salaried practitioners engaged in group practice under a medical director. A clinic is maintained, and limited hospital expenses are defrayed for the members and their dependents.

The defendants are alleged to have conspired (1) to restrain the Association in its business of arranging for the provision of medical care and hospitalization to its members and their dependents, (2) to restrain such members in obtaining, by cooperative efforts, adequate medical care for themselves and their dependents from doctors engaged in group medical practice, (3) to restrain doctors serving on the medical staff of the Association in pursuit of their callings, (4) to restrain other doctors in the District of Columbia, including some of the individual defendants, in pursuit of their callings, and (5) to restrain Washington hospitals in the operation of their businesses.

The demurrers raise basic objections to the indictment. Of first importance is the contention that none of the alleged restraints has reference to a trade; that Section 3 comprehends only those occupations in commercial life carried on in the marts of trade activity; therefore, that the medical profession and the businesses of the Association and hospitals do not constitute "trade" within the purview of the statute. Against this contention the Government's position is that all who are occupied in any activity whereby they supply money's worth

for full money payment are engaged in trade; that Section 3 does cover all such activities; therefore, that the practice of medicine and the businesses of the Association and hospitals do fall within the scope of the statute.

■■■ Is medical practice a trade within the meaning of Section 3 of the Sherman Act? In my opinion, it is not. I think the matter is settled by the Supreme Court in the case of Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 52 S.Ct. 607, 610, 76 L.Ed. 1204. That case squarely presented the question whether "trade" is used in a narrow sense, as importing "only traffic in the buying, selling, or exchanging of commodities", or in a broader sense. It fairly called for a definition of the word. This the Court undertook to give. In so doing, it declared that the word "trade" was used in Section 3 of the Sherman Act in the general sense attributed to it by Justice Story in the case of The Schooner Nymph, 1 Sumn. 516, 18 Fed.Cas. 506, 507, No. 10,388. The Court, intending to give a full and broad meaning, adopted for its own definition of "trade" the language of Justice Story in that early case, quoting therefrom as follows:

"The argument for the claimant insists, that 'trade' is here used in its most restrictive sense, and as equivalent to traffic in goods, or buying and selling in commerce or exchange. But I am clearly of opinion, that such is not the true sense of the word, as used in the 32d section [46 U.S.C.A. § 325]. In the first place, the word 'trade' is often, and indeed, generally used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile. Wherever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, not in the liberal arts or in the learned professions, it is constantly called a trade. Thus, we constantly speak of the art, mystery, or trade of a housewright, a shipwright, a tailor, a blacksmith, and a shoemaker, though some of these may be, and sometimes are, carried on without buying or selling goods."

Thus, we have this recent controlling decision defining the word trade, and expressly excepting the learned professions of which admittedly the practice of medicine is one. The decision is in harmony with others rendered before and after the Cleaners & Dyers case. See Federal Trade Comm. v. Raladam Co., 283 U.S. 643, 51 S. Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191; Graves v. Minnesota, 272 U.S. 425, 47 S.Ct. 122, 71 L.Ed. 331; and Semler v. Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086. The restraints alleged against the doctors in specifications 3 and 4 of the charge are clearly not within the purview of the statute. I cannot accept the refinements of thought whereby it is argued for the Government that the Court in quoting Justice Story was not defining "trade" but merely illustrating the narrow and broad concepts of the word. Nor does the decision lend any support to the idea that by enacting Section 3 Congress intended to exercise *all* its plenary power over the District of Columbia to prohibit restraints against all business activities of the citizen. The Court has simply said that Congress meant to deal effectively with the evils resulting from contracts, combinations and conspiracies in restraint of *trade*—not *all* restraints upon *every* business pursuit, *but only those affecting trade*. Doubtless, in the fullness of its power over the District, Congress could have prohibited restraints upon all occupations of the citizen. But there is nothing in the history of the legislation to suggest the need for such a broad reach of power, and clearly it was not intended.

■■■ The Government has cited many English and American cases dealing with restrictive covenants ancillary to agreements by doctors concerning the sale or conduct of their practice, in which the courts have applied the common law doctrine as to "contracts in restraint of trade". It is argued that these cases have, in a legal sense, drawn medical practice within the orbit of trade, giving to the word a common law meaning to include the professions. From this, it is further argued that at common law restraints upon the practice of medicine were "restraints of trade" and that Congress in the Sherman Act used the term in such a sense. But those cases are beside the point. They do not involve any question as to whether medicine is a trade. They accept the universal understanding of it as a profession. Nor do they define "trade". They merely apply a rule of law. At most such cases serve only to illustrate the development of a legal doctrine, having its origin in contracts concerning tradesmen, which became known as the doctrine "against restraint of trade", and which in course of time was extended and applied to agreements by doctors respecting their professional practice.

The case of Pratt v. Medical Association, 1 K.B. 244, upon which the prosecution places much reliance, is interesting in the similarity of facts there proven and here alleged; yet the legal aspects differ greatly. The suit was a civil action in tort by the plaintiff doctors to recover damages for malicious injury to their means of livelihood. The claim was grounded upon common law principles which hold every man liable in damages for wrongful injury to another's means of livelihood. Combination was not the gist of the action; that circumstance only increased the damage. So here, if the livelihood of group practitioners has been injured by the wrongful acts of the defendants, they too have redress in a civil court. But the charge in the present case is criminal, and to stand must find its sanction, solely in the statute.

■ Coming now to other specifications of the charge, 1, 2 and 5. Is the Association, or are its members or the hospitals, engaged in trade within the meaning of Section 3 of the statute? The Association is alleged to be a non-profit co-operative association of government employees engaged in the business of arranging for the provision of medical care and hospitalization to its members and their dependents. The plan and purpose, it is charged, was to hinder and obstruct the Association in procuring and retaining on its staff qualified doctors; to hinder and obstruct its doctors from the privilege of consulting with others and using the facilities of the Washington hospitals; and to hinder and obstruct the Association in obtaining access to hospital facilities for its members and its doctors from treating and operating upon their patients in the hospitals. The foregoing references to the Washington hospitals, in the plan set forth, form the only support for the 5th specification, charging a purpose to restrain the business of operating said hospitals.

In previous discussion of the Cleaners & Dyers case, I have expressed the view that the Court in giving to the word "trade" its full meaning adopted the definition of Justice Story as its own. That definition covers both the narrow and broad understanding of the term. Its most restricted sense comprehended "traffic in goods, or buying and selling in commerce or exchange". Manifestly, neither the Association, its members or the hospitals are engaged in that sort of trade. Nor do they, in my opinion, come within the broader class, of *manual* or *mercantile* pursuits carried on for *profit or gain* without buying or selling goods. The business of the Association was not of a manual or mercantile nature. It was a non-profit cooperative institution whose corporate object was to render service in providing medical and hospital care for its members. The argument for the Government that the business of the cleaners and dyers involved merely the sale of service, and yet was held to be a trade, overlooks the fact that the very essence of that service was the skillful use of labor and material, quite equal to the "art, mystery or trade" of a tailor, blacksmith or shoemaker, mentioned by Justice Story in illustration of manual and mercantile pursuits falling within the category of trade.

■ Other federal and state decisions bear out the conception of trade as an occupation or pursuit of a mercantile character. See Semler v. Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086; Toxaway Hotel Co. v. Smathers & Company, 216 U.S. 439, 30 S.Ct. 263, 54 L. Ed. 558; United States Hotel Co. v. Niles, 6 Cir., 134 F. 225, 68 L.R.A. 588; Harms v. Cohen, D.C., 279 F. 276 (as to musical composers); People v. Klaw, 55 Misc. 72, 106 N.Y.S. 341 (as to the theatre); Metropolitan Opera Co. v. Hammerstein, 162 App. Div. 691, 147 N.Y.S. 532 (as to grand opera); Werth v. Fire Companies' Adjustment Bureau, 160 Va. 845, 171 S.E. 255 (as to the insurance business); Whitcomb v. Reid, 31 Miss. 567, 569, 66 Am.Dec. 579 (as to dentistry); and State v. McClellan, 155 La. 37, 98 So. 748, 31 A.L.R. 527 (as to the laundry business). The thesis of Government counsel, taken from the opinion in Brighton College v. Marriott, 1 K.B. 312, 316, that "trade" embraces all who habitually "supply money's worth for full money payment", and their contention that the statute should be so broadly construed represents an extreme position which does violence to the common understanding of "trade", rejects authoritative decisions of our courts, and ignores cardinal rules of statutory construction. Their proposition encompasses all gainful work of the citizen. Can it be supposed that if Congress had any such drastic intention it would not have made the purpose clear? Certainly it is not for the courts to stretch an old statute to fit new uses for which it was never intended. United States v. Gradwell, 243 U.S. 476, 488, 37 S.Ct. 407, 61 L.Ed. 857. That would be nothing short of "judicial legislation." The charge that members of the

Association were restrained (specification 2) is devoid of legal substance. Their efforts to obtain group medical care is expressed through the medium of the Association, a corporate entity, distinct from the individual members. Upon no theory can they be treated as engaged in the business of the corporation. Finally, when the indictment is carefully studied in all its parts, each in relation to the others, it is difficult to escape the conclusion that in its substantial realities the scheme set forth *directly* centered upon various forms of restraint to be exerted against physicians in rendering treatment and care to their patients, and that all else is *incidental* to that design. If restraint upon doctors was the only real direct and immediate effect, any indirect effects upon the Association or hospitals would not suffice to support the charges as to them. Standard Oil Co. v. United States, 283 U.S. 163, 179, 51 S.Ct. 421, 75 L.Ed. 926; Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232.

■ The defendants have raised objections to the sufficiency of the indictment as a pleading. These go mainly to the claim that many of the allegations dealing with essential and material features of the charge are vague, indefinite and uncertain. The objections are far too numerous to deal with separately. There is merit to many of them. The indictment is afflicted with vague and uncertain statements. In some instances, material facts are altogether lacking. An important instance concerns the charge that one purpose of the conspiracy was to restrain the business of the Washington hospitals. The indictment is barren of any statement of the business methods used by a single hospital in the letting of its facilities and service to patients. This is fatal to that particular specification, for without such facts it cannot be known whether loss of patients through operation of the scheme would injuriously affect the economic welfare of any hospital. Moreover, the particular plan and purpose of the conspiracy as respects the hospitals is only inferentially stated in that part which deals with the plan and purpose of the scheme as against the Association and its doctors. Such a method of stating a material part of the charge does not meet the fundamental requirement that a criminal accusation be stated fully, clearly, and with directness and certainty. United States v. Hess, 124 U.S. 483, 8 S.Ct. 571, 31 L.Ed. 516; United States v. Geare, 54 App.D.C. 30, 293 F. 997;

McMullen v. United States, 68 App.D.C. 302, 96 F.2d 574.

■ A question also arises as to whether the charge is laid against the individual doctors named in the caption. This is due to the pleader's statement that they "will be referred to. hereinafter as the individual defendants", whereas thereafter the charge itself is laid only against "the defendants", who the caption indicates include only the several medical societies. It does seem that as to such simple, yet all important matters, an indictment should be so drafted as to exclude any question whatever.

■ The inducement, as well as the charging part, setting forth the plan and purpose, and acts done to effectuate the conspiracy, abound in uncertain statements. Inference, opinion, and conjecture are also freely indulged. This is especially so in the inducement, much of which seems unnecessary to a statement of the charge. It is questionable whether some of it would be deemed relevant or competent in proof of the offense. Every indictment should be confined to a clear and dispassionate statement of essential facts. Thus, an accused can better know the exact offense with which he is charged and will not be confused in making his defense. Ordinarily improper matter in the inducement, unnecessary to support the charge, will not vitiate an indictment. It will be treated as surplusage and disregarded. But I doubt if such treatment would suffice to relieve these defendants of the prejudice likely to arise by an indictment which smacks so much of a highly colored, argumentative discourse against them. It must be remembered that when a case is finally submitted to a jury for their secret deliberations the indictment goes with them.

■ The contention is made that the Association is operating illegally in the fields of medicine and insurance; that as its activities are unlawful they do not come under the protection of the statute against restraints of trade. The indictment describes the Association as a non-profit, cooperative society, organized under the laws of the District of Columbia, engaged in the business of arranging for the provision of medical care and hospitalization to its members and their dependents on a risk sharing prepayment basis. This is enough to indicate that it was organized under those sections of the general corporation laws providing for incorporation of societies for benevo-

lent, charitable, educational, literary, musical, scientific or missionary purposes, including societies formed for mutual improvement or promotion of the arts. Thus, the view is strengthened that the Association was not engaged in trade, for such corporate functions clearly would not fall under that category. However, I do not think it can be said from the bare allegations of the indictment, taken in their entirety, that the Association is engaged in medical practice or insurance. Whether or not that is so could better be decided upon the evidence if in a trial it should be deemed pertinent to inquire into the question.

Finally, Section 3 of the Sherman Act, upon which the indictment is founded, has been attacked by defendants as unconstitutional. It is argued that the statute is too vague and uncertain to fix a definite standard of guilt, or inform one accused of violating it of the nature and cause of the accusation. I do not agree with the argument. If I did, the circumstances would not justify me declaring the statute invalid, for that would be unnecessary, hence inappropriate, in view of my holding that the indictment is bad on other grounds.

The several demurrers to the indictment are sustained. Judgment will be entered accordingly.