METROPOLITAN OPERA COMPANY, Respondent, *v.* OSCAR HAMMERSTEIN and ARTHUR HAMMERSTEIN, Appellants.

First Department, April 17, 1914.

Sale — sale of theatrical business with good will accompanied by covenant not to compete with vendee — interstate commerce — when amendment not to compete in business within this State not within the Federal act against monopolies — corporation — when purchase of good will of competitor not ultra vires — master and servant — agreement of servant not to compete with master — covenant of servant not to compete with master's vendee.

Courts of equity will enforce by injunction restrictive covenants made as an incident to the sale of property, business and good will, within proper limitations.

Where the defendants, engaged in producing grand operas in cities of this State, sold their business and good will to the plaintiff, a corporation engaged in a similar business within this State, and covenanted not to produce grand opera in certain cities of this and another State within a period of ten years, an injunction will issue restraining the defendant from a violation of the covenant.

Such contract and covenant do not violate the provisions of the Federal statute entitled "An Act to protect trade and commerce against unlawful restraint and monopolies," commonly known as the Sherman Law. This because said act applies only to cases of interstate and foreign commerce, and the defendants are not engaged in such commerce although they may incidentally import some of their theatrical paraphernalia.

The giving of theatrical representations is not commerce within the meaning of said statute.

As the plaintiff corporation was organized to give theatrical representations and operas and to own the necessary properties, it was not *ultra vires* for it to acquire the business, properties and good will of one engaged in a similar business within this State.

An employer may enter into a valid agreement with his employee not to conduct the same business, or to enter into competition, and the employer on selling his business and good will may convey such covenant on the part of his employee to the purchaser. Hence, and for the same reason, the employee of the person selling his business and good will may covenant directly with the vendee not to carry on a similar business, or enter into competition.

APPEAL by the defendants, Oscar Hammerstein and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 15th day of December, 1913, and also from an order

entered in said clerk's office on the 10th day of December, 1913, granting the plaintiff's motion for judgment on the pleadings pursuant to which order the judgment appealed from was entered.

*Henry A. Wise* and *John B. Stanchfield,* for the appellants.

*Paul D. Cravath,* for the respondent.

Judgment and orders affirmed, with costs, on opinion of PENDLETON, J.

Present — INGRAHAM, P. J., McLAUGHLIN, LAUGHLIN, SCOTT and HOTCHKISS, JJ.

The following is the opinion of PENDLETON, J.:

PENDLETON, J.:

This is a motion by plaintiff for judgment on the pleadings against both of the defendants, and proceeds on the contention that the denials of the allegations of the complaint are directed against immaterial matters only and that the separate defenses alleged in the answers do not state facts sufficient on their face to constitute a defense. The action is in the nature of an action in equity for specific performance, and is brought to enjoin the defendants from producing grand opera in the city of New York in violation of a covenant not to give grand opera in the cities of New York or Boston within a period of ten years from the date of the contract. The covenant in question forms part and parcel of a contract or contracts whereby the defendant Oscar Hammerstein sold his certain properties, business and good will in connection with the giving of grand opera. That courts of equity will by injunction enforce restrictive covenants given as an incident to the sale of property, business and good will within proper limitations as hereinafter pointed out, is too well settled to require the citation of authorities in its support. The complaint adequately sets forth the contract of sale and the covenants sought to be enforced. The defendants answered separately. Each sets up as a separate defense, *first,* that the contract in question was violative of the provisions of the statute of the United States entitled "An Act to protect trade and

commerce against unlawful restraints and monopolies," known as the Sherman Anti-Trust Act;* and *second,* that the contracts as to the plaintiff corporation were *ultra vires.* The defendant Arthur Hammerstein sets up an additional defense applicable to him alone, whereby he alleges that at the time of the contract he had no interest in the property or business sold and was only an employee of the other defendant. The act of Congress referred to has reference only to trade or commerce among the several States or with foreign nations, and it is only covenants and agreements which are in their direct effect in restraint of such trade or commerce that come within the provisions of the act. It is essential, therefore, to have a case under this act that the covenant or agreement in question be in its direct effect in restraint of trade or commerce and that such trade or commerce be trade or commerce among the several States or with foreign nations. The distinction is fundamental and often pointed out, as will hereafter be more fully shown, between contracts which directly affect interstate commerce and those the effect of which on interstate commerce is only incidental, secondary and remote. In the latter class of cases the authorities are clear that such incidental or secondary effect does not bring the contract within the purview of the statute. It is alleged in the pleadings that on or about the time of the execution of the covenants and agreements in question plaintiff and defendant Oscar Hammerstein were engaged in the production of grand opera in the city of New York and to a limited extent in other cities. The covenants sought to be enforced relate directly only to the production of grand opera, and if in their direct effect are in restraint of anything it must be as to that. At the very threshold of the inquiry is, therefore, the question, whether such production is trade or commerce. Is the business of producing grand opera, in its essential characteristics, trade or commerce ? Webster defines " trade " as " the act or business of exchanging commodities by barter; the business of buying and selling for money; commerce; traffic; barter." Commerce is defined as " the exchange of merchandise on a large scale between different places or communities; extended

---

* See 26 U. S. Stat. at Large, 209, chap. 647.— [REP.

trade or traffic." The Standard Dictionary defines commerce as "the exchange of goods, productions of property of any kind, especially on a large scale, as between States or nations." Jacobs' Law Dictionary says trade and commerce are not synonymous. Commerce relates to dealings between foreign nations; trade means mutual traffic among ourselves, or the buying, selling and exchange of articles between members of the same community. In *Gibbons* v. *Ogden* (9 Wheat. 189) Chief Justice MARSHALL said: "Commerce, undoubtedly, is traffic, but it is something more; it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." It is evident the intercourse referred to is commercial intercourse. In *Kidd* v. *Pearson* (128 U. S. 1) Mr. Justice LAMAR says: "No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation — the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation." In *United States* v. *E. C. Knight Co.* (156 U. S. 13) the court says: "The regulation of commerce applies to the subjects of commerce." In *United States* v. *Swift & Co.* (122 Fed. Rep. 529, 531) the court says: "Commerce, briefly stated, is the sale or exchange of commodities." In *New York Life Ins. Co.* v. *Cravens* (178 U. S. 389) it was held that the business of insurance is not commerce; the contract of insurance is not an instrumentality of commerce; the making of the contract is a mere incident of commercial intercourse, and the court very pertinently called attention to the statement in *Hooper* v. *California* (155 U. S. 648) that the contrary contention "involves an erroneous conception of what constitutes interstate commerce." In *Matter of Oriental Society* (104 Fed. Rep. 975) it was held that a corporation incorporated for the purpose of giving theatrical representations was not "trading or following mercantile pursuits."

In *Matter of Duff* (4 Fed. Rep. 519) a theatrical manager was held not to be a merchant or tradesman. In *People* v. *Klaw* (55 Misc. Rep. 72) it was held that plays and entertainments of the stage are not articles and commodities and that the business of owning, controlling and leasing theatres and producing plays or entertainments of the stage is not commerce. The production of opera or other theatrical exhibitions before an audience in exchange for the price of the tickets involves none of the elements of trade or commerce as commonly understood. There is no dealing with an article of trade or commerce nor any use made of any of the instrumentalities of commerce. The holder of the ticket pays a certain price as a consideration for the privilege of experiencing the gratification of an artistic sense. Such a transaction is as far removed as possible from the commonly accepted meaning of trade or commerce. If the production of opera is trade or commerce, it would seem to follow that every museum which exhibits pictures, every university which gives courses of instruction or lectures, every lawyer who prepares a brief, every surgeon who performs an operation, every circus, moving picture show, exhibiting pugilist, actor or performer is engaged in commerce. In the construction of statutes the usual and natural meaning is to be given to words, and it can scarcely be urged that a construction which would include the above in "trade or commerce" would give to the words their usual and natural meaning. If the production of opera is not commerce, the fact of its production, sometimes at one place and sometimes at another, does not make it so. If, then, the thing or matter directly affected by the covenants in question is not commerce, the fact that incidentally in preparation for or to enable it to give, the production plaintiff does some acts or enters into transactions of interstate commerce and uses the instrumentalities of interstate transportation, and to that extent is at times engaged in interstate commerce, does not bring these covenants within the provisions of the act of Congress, for the reason that they do not relate to such acts or activities and the latter are not directly affected thereby. The effect thereon, if there be any, is only incidental, secondary and remote. Such acts and activities are neither an

essential part of the production of opera nor a necessary inci-
dent thereto.   Plaintiff might produce opera in different cities
without engaging in any of such acts or activities; if he does, it is
an entirely collateral matter, and a covenant relating to giving
grand opera can have no direct effect upon transactions form-
ing no necessary part thereof and which it is optional with
plaintiff or any one producing grand opera to enter into or not.
The fact, if it be a fact, that as a result of this contract the
amount of transportation from one State to another might be
curtailed or other acts of interstate commerce be in similar
indirect manner affected does not bring this contract within
the Sherman Anti-Trust Act.   Such effect is incidental only
and secondary.   In *Cincinnati Packet Co.* v. *Bay* (200 U. S.
179) the court says: "It does not appear   *   *   *   that the con-
tract necessarily contemplated commerce between the States.
*   *   *   We will suppose then that the contract does not
leave commerce among the States untouched.   But even on
this supposition it is manifest that interference with such com-
merce is insignificant and incidental, and not the dominant pur-
pose of the contract, if it actually was thought of at all."   In
that case the contract related to the purchase of boats used to
transfer freight and passengers between intrastate points, and
provided that the seller should not for a certain period be engaged
in operating boats between such points.   It was held that the
mere fact that the boats operating on a boundary river between
States sail over some portion of the soil belonging to another
State while passing between the intrastate ports did not make
the contract one affecting interstate commerce, and in that con-
nection the court used the language above quoted.   To hold
every covenant or contract which, however remotely or incident-
ally, might affect some branch of interstate commerce or the
instrumentalities thereof within the statute would be to extend
the application of the act in a manner entirely unauthorized by
the authorities.   In fact it would seem to be difficult to find any
contract which might not in some degree or indirect manner
have such result.   The decisions are numerous that where the
business or thing directly affected by the contracts are not mat-
ters of interstate commerce the mere fact that incidentally in
preparation therefor or as a result thereof, or in some other

collateral or incidental manner, acts or transactions of an interstate commercial character take place does not bring the case within the purview of the act. In *Engel* v. *O'Malley* (219 U. S. 128) it was held that the fact that money deposited in private banks is likely to be transmitted out of the State did not make the deposit interstate commerce, and that, therefore, a State act regulating the receiving of deposits by private banks was not obnoxious to the commerce provision of the United States Constitution. The deposit was held to be an independent transaction preceding the transmission. And in *Diamond Glue Co.* v. *U. S. Glue Co.* (187 U. S. 611) it was held that manufacturing within the State was not interstate commerce because incidentally the manufactured article was to be shipped out of the State for sale. *Williams* v. *Fears* (179 U. S. 270) held that the hiring of laborers in Georgia was not interstate commerce, although they were to be employed without the State and transportation interstate must eventually take place. The court points out the distinction between interstate commerce and the instrumentalities thereof and matters which are merely incidents and no part of such commerce. In *Hopkins* v. *United States* (171 U. S. 578) the court says: "We come, therefore, to the inquiry as to the nature of the business or occupation that the defendants are engaged in. Is it interstate commerce in the sense of that word as it has been used and understood in the decisions of this court? Or is it a business which is an aid or facility to commerce, and which, if it affect interstate commerce at all, does so only in an indirect and incidental manner? * * * The business of defendants is primarily and substantially the buying and selling, in their character as commission merchants, at the stockyards in Kansas City, live stock which has been consigned to some of them for the purpose of sale, and the rendering of an account of the proceeds arising therefrom. The sale or purchase of live stock as commission merchants at Kansas City is the business done, and its character is not altered because the larger proportion of the purchases and sales may be of live stock sent into the State from other States or from the Territories. Where the stock came from or where it may ultimately go after a sale or purchase, procured through the services of one of the defendants at the

First Department, April, 1914.    [Vol. 162.

Kansas City stockyards, is not the substantial factor in the case. The character of the business of defendants must, in this case, be determined by the facts occurring at that city. * * * Notwithstanding these various matters undertaken by defendants, we must keep our attention upon the real business transacted by them, and in regard to which the section of the by-law complained of is made. * * * To treat as condemned by the act all agreements under which, as a result, the cost of conducting an interstate commercial business may be increased would enlarge the application of the act far beyond the fair meaning of the language used. There must be some direct and immediate effect upon interstate commerce in order to come within the act. * * * Many agreements suggest themselves which relate only to facilities furnished commerce, or else touch it only in an indirect way, while possibly enhancing the cost of transacting the business, and which at the same time we would not think of as agreements in restraint of interstate trade or commerce. They are agreements which in their effect operate in furtherance and in aid of commerce by providing for it facilities, conveniences, privileges or services, but which do not directly relate to charges for its transportation, nor to any other form of interstate commerce. To hold all such agreements void would in our judgment improperly extend the act to matters which are not of an interstate commercial nature." In *United States* v. *E. C. Knight Co.* (156 U. S. 1) it was held that trade or commerce might be indirectly affected was not enough. The distinction between agreements which directly affect interstate commerce and those the effect of which on interstate commerce is only secondary and remote was clearly pointed out by the court in *Swift & Co.* v. *United States* (196 U. S. 375), where the agreement or combination was held to relate to interstate sales, and, therefore, directly affect interstate commerce. The court, referring to the *Knight Co. Case* (*supra*) says: "Therefore the case is not like *United States* v. *E. C. Knight Co.* (156 U. S. 1), where the subject matter of the combination was manufacture and the direct object monopoly of manufacture within a State. However likely monopoly of commerce among the States in the article manufactured was to follow from the agreement, it was

not a necessary consequence nor a primary end. Here the subject matter is sales, and the very point of the combination is to restrain and monopolize commerce among the States in respect of such sales. The two cases are near to each other, as sooner or later always must happen where lines are to be drawn, but the line between them is distinct." The cases relied on by defendants are not at all in point; they have all special features not present here. In *Hoke* v. *United States* (227 U. S. 308) it was held that an act of Congress regulating the interstate transportation of persons was within the grant of power to regulate commerce among the several States. The court says: "What the act condemns is transportation obtained or aided or transportation induced in interstate commerce for the immoral purposes mentioned." Transportation between the States is concededly an act in interstate commerce, and it was to such act that the statute in question was directed. It requires no argument to show that that case is not an authority on the question here presented. Congress may well have the power to legislate as to the manner or purpose of transporting from one State to the other theatrical scenery, properties, or the company itself, or make regulations as to such transportation. The existence of such power has no bearing on the question now involved. The *Lottery Case* (188 U. S. 321) is distinguishable on similar grounds. The act of Congress in question related to the carriage of articles between the States. *Hipolite Egg Co.* v. *United States* (220 U. S. 45) was legislation regulating interstate traffic. In *United States* v. *Pacific & Arctic Co.* (228 U. S. 87) the combination was between carriers as to transportation partly within and partly without the United States. In *International Text Book Co.* v. *Pigg* (217 U. S. 91) the gist of the business was the continuous interstate exchange of books, apparatus and papers and correspondence through the mails under contract between plaintiff and its various scholars and agents. The facts in that case as pointed out by the court presented an exceptional condition which deprives it of any real application to the questions here discussed. As to the defense that the contract was *ultra vires* as to plaintiff, it appears that plaintiff is a corporation organized to give theatrical representations

and operas and own all the properties necessary or incident thereto. It is difficult to see why, if the acquisition of plays, opera or theatrical houses, theatrical costumes and other properties incident to theatrical productions is within its corporate power, the purchase of the good will of an operatic or theatrical business, which must be a most valuable asset in carrying out the purposes for which it was incorporated, should not be. If the purchase of defendants' business and good will was within its corporate powers, certainly the covenants necessary for and incident to the protection and securing to it of such good will were equally within its corporate powers. The separate answer of the defendant Arthur Hammerstein raises an entirely different question, and one applicable to him alone, viz., that being an employee and not a part owner of the property sold, his covenant is void at common law as illegally in restraint of trade. That a court of equity will by injunction enforce the performance of restrictive covenants, where such are given as an incident to the sale of property and business and its good will, is well established; such covenants are necessary to give value to and are an incident of the sale of the business and good will, and when partial and only co-extensive with the good will sold are legal, valid and enforcible in a court of equity. Where the restraint imposed by the covenant is no greater than reasonably required for the protection of the legitimate interests of the vendee, and, therefore, incident to the main purpose, to wit, the sale and purchase, the covenants are not invalid as in restraint of trade; they are, on the contrary, conducive to the freedom of trade and right to sell. In *Diamond Match Co.* v. *Roeber* (106 N. Y. 482) the court cites with approval the rule that the true test is " ' whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public.' * * * It is an encouragement to industry and to enterprise in building up a trade that a man shall be allowed to sell the good will of the business and the fruits of his industry upon the best terms he can obtain." The rule and the reasons for it were clearly stated in the case of *United States* v. *Addyston Pipe & Steel Co.* (85 Fed. Rep. 271; affd. in the United States Supreme

Court, *sub nom. Addyston Pipe & Steel Co.* v. *United States,*
175 U. S. 211). The opinion in the Circuit Court was as fol-
lows: " The inhibition against restraints of trade at common
law seems at first to have had no exception. See language of
Justice HULL, Year Book, 2 Hen. V, folio 5, pl. 26. After a
time it became apparent to the people and the courts that it
was in the interest of trade that certain covenants in restraint
of trade should be enforced. It was of importance, as an
incentive to industry and honest dealing in trade, that, after a
man had built up a business with an extensive good will, he
should be able to sell his business and good will to the best
advantage, and he could not do so unless he could bind himself
by an enforceable contract not to engage in the same business
in such a way as to prevent injury to that which he was
about to sell. It was equally for the good of the public and
trade, when partners dissolved, and one took the business, or
they divided the business, that each partner might bind him-
self not to do anything in trade thereafter which would derogate
from his grant of the interest conveyed to his former partner.
Again, when two men become partners in a business, although
their union might reduce competition, this effect was only an
incident to the main purpose of a union of their capital, enter-
prise and energy to carry on a successful business, and one
useful to the community. Restrictions in the articles of part-
nership upon the business activity of the members, with a view
of securing their entire effort in the common enterprise, were,
of course, only ancillary to the main end of the union, and were
to be encouraged. Again, when one in business sold property
with which the buyer might set up a rival business, it was cer-
tainly reasonable that the seller should be able to restrain the
buyer from doing him an injury which, but for the sale, the
buyer would be unable to inflict. This was not reducing com-
petition, but was only securing the seller against an increase
of competition of his own creating. Such an exception was
necessary to promote the free purchase and sale of property.
Again, it was of importance that business men and professional
men should have every motive to employ the ablest assistants,
and to instruct them thoroughly; but they would naturally
be reluctant to do so unless such assistants were able to bind

themselves not to set up a rival business in the vicinity after learning the details and secrets of the business of their employers.   *   *   *   It would be stating it too strongly to say that these five classes of covenants in restraint of trade include all of those upheld as valid at the common law; but it would certainly seem to follow from the tests laid down for determining the validity of such an agreement that no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party." In *Dr. Miles Medical Co.* v. *Park & Sons Co.* (220 U. S. 373) the rule is thus stated: " With respect to contracts in restraint of trade, the earlier doctrine of the common law has been substantially modified in adaptation to modern conditions. But the public interest is still the first consideration. To sustain the restraint it must be found to be reasonable both with respect to the public and to the parties, and that it is limited to what is fairly necessary, in the circumstances of the particular case, for the protection of the covenantee. Otherwise restraints of trade are void as against public policy." The opinion in *United States* v. *Addyston Pipe & Steel Co.* quotes, with approval, Baron PARKE as follows (*Mallan* v. *May*, 11 Mees. & W. 653): " Contracts for the partial restraint of trade are upheld not because they are advantageous to the individual with whom the contract is made and a sacrifice *pro tanto* of the rights of the community, but because it is for the benefit of the public at large that they should be enforced. Many of these partial restraints on trade are perfectly consistent with public convenience and the general interest and have been supported. Such is the case of the disposing of a shop in a particular place, with a contract on the part of the vendor not to carry on a trade in the same place. It is, in effect, the sale of a good-will, and offers an encouragement to trade by allowing a party to dispose of all the fruits of his industry.   *   *   *   And such is the class of cases of much more frequent occurrence, and to which this present case belongs, of a tradesman, manufacturer or professional man taking a servant or clerk into his service, with a contract that

he will not carry on the same trade or profession within certain limits. * * * In such a case the public derives an advantage in the unrestrained choice which such a stipulation gives to the employer of able assistants and the security it affords that the master will not withhold from the servant instruction in the secrets of his trade, and the communication of his own skill and experience, from the fear of his afterwards having a rival in the same business." If a contract by an employee with his employer not to enter into the same business or compete is not illegally in restraint of trade for the reasons above given, in order to sell his business and good will protected by such a covenant the employer must have the right to transfer to his vendee the benefit and protection of such covenant. If the right of enforcing such a covenant can be vested in the vendee by assignment, it is difficult to see why the same covenant made by the employee directly with the vendee, as an incident of the sale, is an illegal restraint of trade. It accomplishes directly what concededly might be accomplished indirectly, and if the contract of the employee with the employer is not illegally in restraint of trade, the same contract with the vendee of the employer, made as an incident to and part of the contract of sale where the restraint is no greater than required by the legitimate interest of the vendee, is equally not illegally in restraint of trade. The opinion in *United States* v. *Addyston Pipe & Steel Co.* (*supra*), is not so much an enumeration of the special cases where covenants of the character referred to are deemed valid as a statement of the principle of the rule and the reasons therefor, as is shown by the last clause above quoted of such opinion, and that principle is that, where the covenants are an incident of the sale and made only as a reasonable provision for the protection of the vendee, they are valid for the reason that they are not really in restraint, but are, on the contrary, in the interest of freedom of trade, as they tend to permit that to be sold and disposed of which, without the protection of such covenants, might not be. *Davis* v. *Booth & Co.* (131 Fed. Rep. 31); *National Gum & Mica Co.* v. *Braendly* (27 App. Div. 219), and *Anchor Electric Co.* v. *Hawkes* (171 Mass. 101) are cases where such covenants by third parties have been sustained, and although they have

some features not present here they illustrate the rule that the test is whether the covenants as made are reasonably necessary for the protection of the vendee. The contract specifically states the objects and purposes of the parties in having defendant Arthur Hammerstein join in the covenants. The allegations of the answer are largely allegations of conclusions rather than facts. I think plaintiff is entitled to judgment. In view of the above conclusions, it is needless to consider the other questions discussed on the argument. Motion for judgment for plaintiff granted, with leave to defendants to amend their answers within twenty days on payment of costs before notice of trial and costs of this motion.