II. B. MARIENELLI, Limited, v. UNITED BOOKING OFFICES OF
AMERICA et al.

(District Court, S. D. New York. July 31, 1914.)

1. COMMERCE ☞43, 44—INTERSTATE COMMERCE—WHAT CONSTITUTES—THEA-
TER BOOKING AGENCY.

Where vaudeville theaters were arranged in circuits, and it was the
practice to book performers for the whole or part of one circuit under
one contract, requiring them to pass from theater to theater and from
state to state, taking with them certain paraphernalia and stage proper-
ties, certain aspects of the business of the theater owners and their book-
ing agents constituted interstate commerce, as, for instance, the con-
tracts under which the performers were to go from state to state, ful-
filling their contracts as much by the travel as by the acting, the car-
riage of their stage properties and paraphernalia from one state to an-
other, and the sending by the theaters themselves from state to state
of scenery and advertising matter.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 32, 35; Dec.
Dig. ☞43, 44.]

2. MONOPOLIES ☞12—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE.

Whether a combination causes a restraint of interstate commerce must
be judged by the usual rule of legal responsibility; that is, whether the
effect upon the interstate movement of goods or persons is within those
consequences which would reasonably be supposed to result from the acts
of the parties, but results insignificant in proportion to the total effect will
be disregarded.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec.
Dig. ☞12.]

3. MONOPOLIES ☞12—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE.

A number of vaudeville theaters scattered over the United States were
arranged into circuits, and it was the practice to book performers over
the whole or part of one circuit under one contract, requiring them to pass
from state to state, taking with them certain paraphernalia and stage
properties. The owners of such theaters and their booking agents entered
into a combination or conspiracy in restraint of their own business,
whereby the theater owners were not to employ performers not booked
through booking agents, and the booking agents were not to act for any
theater employing any other booking agent, or employing any perform-
er who played outside such circuits, or who had as a representative any
person who had obtained employment for a performer outside such cir-
cuits. Any theater employing such a performer would be blacklisted, and
the booking agents would not act for it. *Held*, that the effect of a mo-
nopoly of such business upon interstate commerce was not so inconsider-
able as not to come within the Sherman Act (Act July 2, 1890, c. 647, 26
Stat. 209).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec.
Dig. ☞12.]

4. MONOPOLIES ☞12—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE.

That a state has power to tax a business is not determinative that a
combination monopolizing such business is outside the Sherman Act; nor
does it follow, because a combination is within the act, that the business
may not be subject to a state tax.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec.
Dig. ☞12.]

5. MONOPOLIES ⊚⟼12—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE.
A combination may be within the Sherman Act, though concerned in great part with internal matters.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ⊚⟼12.]

6. MONOPOLIES ⊚⟼12—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE.
In an action for damages caused to plaintiff by a combination in restraint of interstate commerce, it is immaterial whether the acts in pursuance of the combination which injured plaintiff were themselves acts of interstate commerce; the illegality arising from the project or plan as a whole.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ⊚⟼12.]

7. MONOPOLIES ⊚⟼12—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE.
A combination between a number of vaudeville theaters and their booking agents, the purpose of which is to keep all first-class performers for such theaters, refuse to allow them to act if they act in other theaters, and refuse to allow other theaters to have their performers if they employ other performers, and refuse to deal with performers' agents who book such performers elsewhere, is in restraint of trade, where it is alleged that, outside of the circuits into which such theaters are arranged, first-class performers cannot obtain sufficient employment in the United States and Canada to make a living, as the necessary inference is that, if successful, the parties to the combination will control all first-class performers, and monopolize the supply, and thus control the business.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ⊚⟼12.]

8. MONOPOLIES ⊚⟼28—COMBINATIONS IN RESTRAINT OF TRADE—DAMAGES.
The damages sustained by a performer's agent blacklisted by the members of such combination were within the seventh section of the Sherman Act (Comp. St. 1913, § 8829), providing that any person, injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by that act, may sue therefor and recover threefold the damages sustained.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. ⊚⟼28.]

9. MONOPOLIES ⊚⟼28—COMBINATIONS IN RESTRAINT OF TRADE—ACTIONS—PARTIES.
In an action for damages caused by such combination, all of the parties privy to the general plan were properly joined, though the execution of different parts of the plan was confined to individuals.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. ⊚⟼28.]

At Law. Action by H. B. Marienelli, Limited, against the United Booking Offices of America and others. On demurrer to the complaint. Demurrer overruled.

This is a demurrer to a complaint at law for damages under the Sherman Act. Its general outline is as follows: The individual defendants collectively own many vaudeville theaters scattered over the United States, which are, roughly, arranged in two circuits—an Eastern circuit, comprising those owned by one set of the defendants, and with other theaters known as the "Keith circuit," and a Western circuit, comprising those owned by other defendants, and with other theaters known as the "Orpheum circuit." The owners of the other theaters making up these two circuits are not parties to the action. The entertainments in these theaters are each made up of short, disconnected acts, aggregating altogether two or three hours. The performers play at a given

place not over one week at a time, and the practice is for them to be booked under one contract upon the whole or part of one circuit, making contracts which require them to pass from theater to theater and from state to state, taking with them certain paraphernalia and stage properties. The two corporate defendants are severally booking agents for the two circuits, securing performers to travel upon the whole or part of each circuit and in general acting as agents for the managers or owners.

Up to the time of the acts here in question the plaintiff maintained offices in London, Paris, Berlin, and New York, from which it observed and sought out all promising vaudeville performers, and advised the defendants when it knew of them, thus establishing a kind of clearing house of information between performers and managers. If opportunity offered, it induced performers to come to this country from other countries, and acted as their agent in procuring for them contracts to perform on one or both of the circuits through the whole or a part of the theaters comprised in it. It arranged for the performer's entrance into the country, passing through the customs his paraphernalia, apparatus, etc., and it advised and helped him to carry them about with him. In general, the plaintiff acted as agent for the performers and as their personal representative in negotiations and contracts with the managers of the theaters, acting through the corporate defendants.

All the defendants entered into a combination or conspiracy in restraint of their own business, to be accomplished as follows: The Eastern owners were not to employ any one not booked through the Eastern booking corporation, which was not to act for any theater which employed another booking agent. They were to procure the assent of the other theaters in the Keith circuit to this plan. They agreed to employ no performer who played outside of the two circuits, and would blacklist any such and post him with the other theaters; the Eastern booking corporation refusing to act for any theater that disregarded the blacklist. No one should be employed who had as a representative any person who had obtained employment for a performer outside of the two circuits, and if any theater employed a performer who had such a representative the Eastern booking corporation should not act for that theater. All such representatives of performers should be blacklisted, and might not thereafter negotiate with the Eastern booking corporation, which would not act as agent for any theater who billed a performer represented by a blacklisted agent. Any theater billing a blacklisted performer should be blacklisted, and the Eastern booking corporation would no longer act for it. The Western booking corporation should be advised of these blacklists.

Similar allegations were made relating to the Western circuit. The defendants in pursuance of this plan did blacklist the plaintiff, and caused notices to be sent out to that effect, and so entirely destroyed the plaintiff's business.

Henry A. Wise, of New York City, for plaintiff.
George W. Wickersham, of New York City, for defendants.

LEARNED HAND, District Judge. [1] The combination or conspiracy is alleged to be in restraint of the defendants' business, and the first inquiry must be of the nature of the business. Undeniably certain aspects of the business are interstate commerce, as, for instance, the contracts made by the booking companies under which the performers must go from state to state, throughout the circuit, acting here and there, and fulfilling their contracts as much by the travel as by the acting. Since Hoke v. United States, 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905, and Wilson v. United States, 232 U. S. 563, 34 Sup. Ct. 347, 58 L. Ed. 728, it cannot be doubted that this feature of the business was within the complete powers of Congress, for such purposes as it might find to the public interest. This, moreover, applies as well to that feature, incidental to the foregoing, which consists in the carriage of the

performers' stage properties and paraphernalia from one state to another, a necessary part of the performance of their contracts with the defendants. The Lottery Cases, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492. The same may be said of the scenery and advertising matter sent from state to state by the theaters themselves. In respect of all these details the business, therefore, consists of interstate commerce.

[2] The nature of the defendants' business is one thing, determinative in cases where the question arises of a state license tax or the like; the subject-matter of their combination is, at least formally, different. Perhaps the distinction has small practical consequence here, yet it is important in such shifty questions to keep the principles in mind. No doubt the proposition still stands good that the restraint of interstate commerce must be direct (United States v. Patten, 226 U. S. 543, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. [N. S.] 325), just as it did when E. C. Knight v. United States, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, was decided; but nobody can intelligently read the decisions without becoming aware that the actual meaning of the words has greatly changed. All the cases, of course, presuppose that the contract has an effect upon the transit of some goods or persons across state lines, but just what that effect must be is the point of divergence. From some expressions of the earlier cases it might be supposed that the agreement must in its terms concern the transit, or in other words that the conscious purpose of the parties must be to change movement, which would otherwise occur; but that rule is not now the law. Since perhaps Addyston Pipe Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, and certainly since United States v. Patten, supra, a case which had an unusual degree of consideration by the Supreme Court, it must be understood that the combination must be judged by the usual rule of legal responsibility; that is to say, whether the effect upon the movement of goods or persons is within those consequences which would reasonably be supposed to result from the parties' acts.

The words "direct" and "indirect" permit of some latitude, as the cases show. In nature all results are equally inevitable, and the category has no useful application; it would be arbitrary and meaningless. Only when we speak of conscious persons, necessarily ignorant of all the causes which actually operate, can the distinction become useful; and it is, of course, only in relation to persons that it is used juristically. As I have said, the rule no longer is that only those results are direct which fall within the immediate purpose, or high light of intention, a rule which would eliminate consequences, certain enough to follow, but neither desired nor intended. When once that test is abandoned, there remains only the common test of legal responsibility, which I have mentioned, or else the test of more or less. It may be that some effects of a combination, certain enough to follow, bear so small a proportion to the sum total that the Sherman Act will not reach the combination as a whole. Although the statute may seem intended to exercise the federal power to its fullest capacity, and although Congress no doubt might make illegal any combination which to the parties' knowledge affected interstate commerce in any degree what-

ever, the decisions of the Supreme Court certainly prove that it has not been so interpreted, and that results insignificant in proportion to the total effect will be disregarded. This, in any case, is the present meaning of the test of "direct" and "indirect" as I understand it in the development of the decisions.

[3] If this be so, then the case depends upon whether the effect upon interstate commerce of a monopoly of the defendants' business is so inconsiderable as not to come within the statute. In the light of the allegations, I do not think that it is such. It may well be that the results of a monopoly of the playhouses within a single state would not come within the statute, though it were shown inevitably to affect the entrance or exit from the state of performers and their accouterments, and though that result were obvious to the parties concerned from the outset. Here there is no such case, because here the contracts of hiring involve for their performance the transit quite as much as the performance. I cannot say that this feature is so inconsiderable a part of the business that it must be disregarded; I must say that it is within the necessary consequences of their acts.

[4, 5] The cases do not seem to me to give a solution for a new situation, for each stands upon its own facts. The insurance cases, ending in New York Insurance Company v. Deer Lodge County, 231 U. S. 495, 34 Sup. Ct. 167, 58 L. Ed. 332, perhaps stand somewhat apart; in any event, they became fixed at an early period and have been continuously reasserted without opportunity for variation. Moreover, the incidental effect upon interstate commerce bears but a small proportion to the business as a whole. They are significant, also, as arising under the legality of a state tax. In this respect they are like Williams v. Fears, 179 U. S. 270, 21 Sup. Ct. 128, 45 L. Ed. 186, Ware v. Mobile County, 209 U. S. 405, 28 Sup. Ct. 526, 52 L. Ed. 855, 14 Ann. Cas. 1031, and U. S. Fidelity Company v. Kentucky, 231 U. S. 394, 34 Sup. Ct. 122, 58 L. Ed. 283. In such cases it is of course apparent that, if a state is to have the power to tax at all, all businesses may not be excluded which in any way have an effect upon interstate commerce, even though Congress might regulate them to the extent that they did. If the rule in Gibbons v. Ogden, 9 Wheat. 4, 6 L. Ed. 23, that the spheres of regulation are mutually exclusive, be so rigidly applied as this, the system will not work. There are indications enough that there is now thought to be a range of governmental activity which the states may enjoy until Congress intervenes. The Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511.

I cannot, therefore, regard those cases as necessarily determinative, in which the question only was of the power of the state to tax a local business, nor does it follow from them that a combination monopolizing the same business is necessarily outside of the Sherman Act. Of course, persons not engaged in interstate commerce may violate the Sherman Act. Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815. But I mean more than this, for in the case at bar the combination relates to the business as a whole, and not to the interstate features of it. It does not follow, because the combination is within the act, that the business may not be subject to

a state tax. How far the effects upon interstate commerce of the combination must preponderate to bring it within this statute is not a question of the extent of federal powers, but of the extent to which Congress intended to exert such powers. That it intended to reach every conceivable restraint of such commerce may not be true, and the degree to which it reaches is not measured by the power of the states in the regulation of their internal affairs until Congress intervenes. It is no objection that the combination declared illegal shall be concerned in great part with internal matters.

[6] Nor need we be concerned with the question whether the acts in pursuance of the combination which injure the plaintiff are themselves a part of interstate commerce, for the illegality arises from the project or plan as a whole (Swift v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232), and the performance, innocent without it, takes its color from its setting.

The case of Metropolitan Opera House v. Hammerstein, 162 App. Div. 691, 147 N. Y. Supp. 532, decided by the Appellate Division of the Supreme Court, is not necessarily an authority to the contrary. There the plaintiff was in the habit of presenting opera in several states, and sent its performers, scenery men, and stage properties about as occasion required. It also imported artists from Europe to perform in New York and elsewhere. These elements of its business were certainly interstate, and within the express control of Congress, and the questions turned, as here, whether a monopolization of the business was a restraint upon interstate commerce. If the test really be the proportion of these features to the business as a whole, obviously the case is not an authority, unless the facts are the same. They differ at least in this respect: That it was not there the course of the business to book all performers under one contract, which required them to go from one state to another. Suppose the case of a traveling troupe of players, who were constantly on tour from state to state at short "stands," and who had no fixed playhouse; certainly their business would be interstate. On the other hand, a combination of local playhouses might not be in restraint of interstate commerce, though it affected the interstate movement of actors or scenery. The defendants' business is not so wholly interstate as though they managed a troupe of traveling players, because they own theaters; but it consists none the less in universally securing from the outset that substantially each player shall in fact travel upon interstate tour. I think it fair, fully recognizing the loose character of the distinction, to call the interstate element in the case at bar "essential," and that in Metropolitan Opera Co. v. Hammerstein "incidental." The rule is not so much a constitutive principle as a regulative guide.

[7, 8] There remains the final question as to whether the combination is in restraint of trade. The allegations show that the purpose of the defendants was to exclude from the two circuits any performer who would not deal exclusively with them, any theater which employed any other booking agent or performer, and any performer's agent who dealt with outsiders. Not every contract which destroys a com-

petition, theretofore existing, is within the act; but those are which put a market into one hand. Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 843, Ann. Cas. 1912D, 734. It is the effort to secure control over prices by a control over supply which counts. No doubt "market" is a vague word; a combination may control within such narrow limits that new supplies are available at trivial advances; perhaps such combinations do not "prejudice the public interests." Nash v. United States, 229 U. S. 373, 376, 33 Sup. Ct. 780, 57 L. Ed. 1232. If the combination does not control enough of the supply to fix prices at all, it cannot be an unreasonable restraint of trade prejudicial to the public. In the case at bar the allegations show that the defendants are trying to keep all "first-class" performers for their own theaters, refusing to allow them to act, if they act elsewhere, refusing to allow other theaters to have the circuits' performers if they take others, refusing to deal with any performers' agents who book them elsewhere. Article XIX of the complaint alleges that "first-class" performers cannot obtain sufficient employment in the United States and Canada outside the two circuits to make a living. The necessary inference is that the defendants, if successful, will control all "first-class" performers and succeed in monopolizing the supply. This, in turn, enables them to control the whole business, and constitutes the very conditions which the Sherman Act means to prevent. If in the execution of that project they injure the plaintiff, the resulting damages are within the seventh section of the act.

[9] The complaint is not bad for misjoinder; all the defendants are asserted to be privy to the general plan, and it does not matter that the execution of different parts is confided to individuals. The rules regulating original conspiracies obtain in such cases.

Demurrer overruled; defendants to answer over in 20 days.

―――――

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes